953 F.2d 1431
 RICHMAN BROTHERS RECORDS, INC.
v.
U.S. SPRINT COMMUNICATIONS COMPANY,
Richman Brothers Records, Inc., Appellant in No. 90-5607.
U.S. TELECOM, INC., a Kansas corporation, as a partner in
U.S. Sprint Communications Company; GTE Communications
Services Incorporated, a Delaware corporation, as a partner
in U.S. Sprint Communications Company; U.S. Sprint
Communications Company, a New York Partnership
v.
RICHMAN BROTHERS RECORDS, INC.,
U.S. Sprint Communications Company, Appellant in No. 90-5657.
 Nos. 90-5607, 90-5657.
 United States Court of Appeals,
Third Circuit.
 Argued April 3, 1991.
Decided Dec. 31, 1991.
Rehearing and Rehearing In Banc Denied Feb. 3, 1992.
 
 Glenn B. Manishin (argued), Blumenfeld & Cohen, Washington, D.C., and James Greenberg, Greenberg, Shmerelson &
 Weinroth, Camden, N.J., for Richman Bros. Records, Inc.
 Vincent J. Paluzzi (argued), Hannoch Weisman, Trenton, N.J., and Michael B. Fingerhut, U.S. Sprint Communications Co., Washington, D.C., for U.S. Sprint Communications Co.
 Gene Kimmelman, Legislative Director, Consumer Federation of America, and F. Thomas Tuttle, Law Offices of F. Thomas Tuttle, Washington, D.C., for amicus curiae Consumer Federation of America.
 Present MANSMANN and HUTCHINSON, Circuit Judges, and O'NEILL, District Judge.*
 OPINION OF THE COURT
 HUTCHINSON, Circuit Judge.
 
 I.
 
 1
 Richman Brothers Records, Incorporated (Richman) appeals an order of the United States District Court for the District of New Jersey which it claims directs the clerk of that court "to immediately transfer" both Richman's action against U.S. Sprint Communications Company (Sprint), as well as Sprint's consolidated action against Richman, to the Secretary of the Federal Communications Commission (Commission). Sprint, a non-dominant carrier of telephone communications, has on file with the Commission a tariff that purports to limit Sprint's liability for damages from faulty service to restitution. Richman says this transfer order is a final order because its text shows the district court wholly relinquished jurisdiction over both Sprint's action for payment of its charges to Richman and Richman's claim for negligent service to the Commission or, in any event, on analogy to abstention orders, effectively put Richman out of court. Accordingly, Richman says we have appellate jurisdiction over its appeal. On the merits, Richman asks us to hold that Sprint cannot effectively limit its liability by the terms of a tariff Sprint elected to file with the Commission.
 
 
 2
 Sprint contends that we lack jurisdiction because the transfer order merely refers to the Commission a discrete issue: whether the limitation on liability in a tariff of rates that the Commission says the law permits, but does not require, a non-dominant telecommunication carrier[1] to file, under the Communications Act of 1934 (Act), see 47 U.S.C.A. §§ 151-613 (West 1990), is valid, and, if so, what its effect is. Sprint says the transfer order is an interlocutory judicial deferral to an administrative agency with primary jurisdiction over an issue requiring the specialized knowledge of that agency. In a protective cross-appeal, Sprint asks us to hold that the district court erred in vacating its prior partial summary judgment order in favor of Sprint and in thereafter allowing Richman to amend its complaint to add a fraud count.
 
 
 3
 We hold that the district court intended to do no more than transfer to the Commission the question of the validity and effect of the liability limitation in Sprint's tariff and accordingly stayed the case pending a final order of the Commission that decides that question. Because transfer orders of this kind are not final, appealable orders, we hold that we lack appellate jurisdiction over Richman's appeal. Accordingly, we will dismiss Richman's appeal and Sprint's protective cross-appeal without passing on the merits of the issues they raise concerning the effect of liability limiting provisions in tariffs non-dominant telecommunication carriers elect to file under section 203(a) of the Act. As we shall see, the need to resolve these complex issues was triggered by Sprint's seemingly simple action to collect an unpaid bill and Richman's claim that it was seriously damaged by Sprint's negligence in performing Sprint's contract with Richman for the provision of telecommunication services.
 
 II.
 
 4
 The parties' dispute over Sprint's performance of its contract with Richman first reached the courts on August 1, 1988, when Sprint brought an action against Richman in the United States District Court for the District of Kansas. By this action, Sprint sought to collect $57,806.77 in telephone charges it had billed Richman together with interest on that amount. On August 26, 1988, Richman took legal action by filing a claim against Sprint in the Superior Court of New Jersey, Law Division. In the New Jersey action, Richman alleged that Sprint had not only been grossly negligent when it installed Richman's long-distance phone lines but had also engaged in fraudulent and willful misconduct in connection with its contract to provide telecommunication service to Richman. Accordingly, Richman sought consequential and treble damages under the New Jersey Consumer Fraud Act, N.J.Stat.Ann. §§ 56:8-1 to 56:8-48 (West 1989), as well as punitive damages.
 
 
 5
 Sprint removed Richman's suit to the United States District Court for the District of New Jersey. Sprint's Kansas action was also transferred from the Kansas district court to the New Jersey district court on March 6, 1989. In the New Jersey district court, the two cases were consolidated for all purposes by order entered on March 28, 1989.
 
 
 6
 Sprint moved for partial summary judgment claiming that its liability was limited by a tariff that it filed with the Commission and sought dismissal of Richman's claim under the New Jersey Consumer Fraud Act. The district court granted Sprint's motion, limiting its liability for negligence to the amounts set forth in the tariff and dismissing Richman's New Jersey Consumer Fraud Act claim.
 
 
 7
 Richman filed a motion for reconsideration pursuant to Federal Rule of Civil Procedure 59(e) and alternately sought certification of the tariff issue for interlocutory appeal pursuant to 28 U.S.C.A. § 1292(b) (West Supp.1991). Richman contended, inter alia, that the district court had erroneously decided the provision in Sprint's elective tariff limiting its common law liability for negligence was valid and effective. Richman also sought leave to amend its complaint to add a claim of fraudulent inducement against Sprint.
 
 
 8
 The district court granted reconsideration with an opinion and order issued June 22, 1990. In them, the district court vacated its April 6 opinion and order, granted Richman leave to amend its complaint to include the fraudulent inducement action and directed the clerk thereafter "to immediately transfer the cases to the ... Commission."[2] Appendix (App.) at 370. The district court did not grant Richman's motion to certify the tariff issue for interlocutory appeal. Richman promptly filed an amended complaint adding its claim for fraud in the inducement and, on July 11, 1990, filed this timely appeal from the order "transfer[ring]" the action to the Commission.
 
 
 9
 On July 25, 1990, the Clerk of this Court advised the parties that Sprint's appeal would "be submitted to a panel of this Court for possible dismissal due to a jurisdictional defect." Letter from Bradford A. Baldus to Counsel, July 25, 1990, at 1. Referring to our decision in Brotherhood of Maintenance of Way Employees v. Consolidated Rail Corp., 864 F.2d 283 (3d Cir.1988), the Clerk asked the parties to file an appropriate response concerning the finality of the district court's "transfer" order. Both parties have filed responses. In the meantime, on July 26, Sprint had filed a timely cross-appeal for the purpose of preserving its merits contention that the district court erred in vacating the initial order granting Sprint partial summary judgment on the limitation of liability issue.
 
 
 10
 Sprint itself challenges this Court's appellate jurisdiction and has filed a motion to have both appeals dismissed for lack of appellate jurisdiction. In support of its motion to dismiss, Sprint's main contention is that the district court's transfer order is not a final appealable order because it did not dispose of Sprint's consolidated action for payment of Sprint's telecommunication charges to Richman. In support Sprint cites Bergman v. City of Atlantic City, 860 F.2d 560 (3d Cir.1988).
 
 
 11
 Richman seeks dismissal of Sprint's cross-appeal while itself opposing Sprint's motion to dismiss Richman's appeal from the transfer order. Sprint replies that the Court must hear the appeals of both parties or neither. All these motions, along with the parties' responses to the Clerk's request that they comment on the issue of appealability as affected by Brotherhood, are now before us for disposition.III.
 
 
 12
 To understand the procedural posture of this case, a description of the statutory and regulatory background to the dispute over Sprint's contract to provide Richman with telecommunication services is needed. That background is provided by the Act as amended and the regulations and general orders the Commission has made in exercising its regulatory authority under the Act. See generally 47 U.S.C.A. §§ 151-613. Specifically, Title II of the Act governs the activities of common carriers. See id. §§ 201-26. A common carrier is defined by the Act as:
 
 
 13
 [A]ny person engaged as a common carrier for hire, in interstate or foreign communication by wire or radio or in interstate or foreign radio transmission of energy, except where reference is made to common carriers not subject to this chapter....
 
 
 14
 Id. § 153(h). It is undisputed that Sprint is a common carrier.
 
 
 15
 Under the Act, every common carrier must file with the Commission for public display a schedule of charges. Id. § 203(a). This schedule is commonly known as a tariff. See MCI Telecommunications Corp. v. FCC, 765 F.2d 1186, 1189 (D.C.Cir.1985). Changes "in the charges, classifications, regulations, or practices" in a filed tariff may only be made after the Commission and the public have been given 120-days notice of the change, see 47 U.S.C.A. § 203(b)(1), unless the Commission has shortened the notice period, see id. § 203(b)(2). A carrier can charge only the rates listed in the tariff. See id. § 203(c)(1). "[A]ny classifications, regulations, or practices affecting such charges" must also be specified in the tariff. Id. § 203(c)(3).
 
 The Act provides that a common carrier's
 
 16
 charges, practices, classifications and regulations for and in connection with ... communication service, shall be just and reasonable, and any such charge, practice, classification or regulation that is unjust or unreasonable is ... unlawful.
 
 
 17
 Id. § 201. Unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities or services by a common carrier is unlawful. Id. § 202.
 
 
 18
 The Commission may assess civil damages against a common carrier for violations of the Act. Id. §§ 206, 209. While a complainant may pursue a remedy for violations of the Act before the Commission or in a federal district court, the complainant must elect one forum or the other. Id. § 207. The filing of a suit in federal court, however, does not deprive the Commission of its primary jurisdiction.[3] See generally L. Jaffe, Judicial Control of Administrative Action 121-23 (1965) (describing the doctrine of primary jurisdiction and its operation once an action is brought in court).
 
 
 19
 Section 208 allows the Commission to conduct investigations concerning complaints that common carriers has acted in contravention of the Act. See 47 U.S.C.A. § 208. Thus, once the tariffs are in effect, specific complaints about compliance with them, as well as their validity, are subject to challenge before the Commission even though the complaint involves a part of a tariff that the Commission has already approved. International Business Mach. v. FCC, 570 F.2d 452, 456 (2d Cir.1978). The usual time table for investigation under section 208 is twelve to fifteen months depending on the complexity of the case. See 47 U.S.C.A. § 208(b).
 
 
 20
 In 1979 the Commission began rulemaking proceedings under the Act to consider whether it needed to revise its regulations concerning common carriers because of the far-reaching changes that took place in the industry during the 1970's. See In re Policy and Rules Concerning Rates for Competitive Common Carrier Services and Facilities Authorizations Therefor, First Report and Order, 85 F.C.C.2d 1, 5 (1980) (hereinafter First Report ). The First Report divided common carriers into two groups: dominant and non-dominant. Id. at 10. Those carriers who have enough market power to control price are dominant carriers. All others are non-dominant carriers. See id. at 10-11. Although it has relaxed regulatory oversight for non-dominant carriers in some areas, i.e., financial reporting and facilities authorizations, see id. at 11, the Commission was careful to note in the First Report that "its action ... does not relieve non-dominant carriers from complying with the provisions of Sections 201-205 of the Act.... It merely modifies the method by which the Commission assures compliance with these requirements." Id. at 18. Under the modification, it is assumed that the rates and conditions a non-dominant carrier sets out in a filed tariff are lawful for purposes of sections 201(b) and 202(a) of the Act. This assumption is premised on the Commission's finding that:
 
 
 21
 [F]irms lacking market power simply cannot rationally price their services in ways which, or impose terms or conditions which, would contravene Sections 201(b) and 202(a) of the Act.... [A] non-dominant competitive firm, for example, will be incapable of violating the just and reasonable standard of [section] 201(b).
 
 
 22
 Id. at 31. The statutory authorities the Commission cited in support of its rule are sections 151 and 154 of the Act. Id. at 13. They charge the Commission generally with the duty to make available rapid, efficient communication service, 47 U.S.C.A. § 151, and give it the authority to promulgate rules to that end, id. § 154(i).
 
 
 23
 Two years after the First Report, the Commission issued In re Policy and Rules Concerning Rates for Competitive Common Carrier Services and Facilities Authorizations Therefor, Second Report and Order, 91 F.C.C.2d 59 (1982) (hereinafter Second Report ). The Second Report embodies a Commission policy now known as "permissive forbearance." In the Second Report, the Commission concluded that the regulatory scheme was inefficient. Id. at 73. Therefore, the Commission decided that "resale carriers ... no longer need adhere ... to the tariff filing requirements of Section 203." Id. (footnote omitted).
 
 
 24
 The permissive forbearance policy was expanded to include specialized non-dominant carriers in In re Policy and Rules Concerning Rates for Competitive Common Carrier Services and Facilities Authorizations Therefor, Fourth Report and Order, 95 F.C.C.2d 554, 557 (1983) (hereinafter Fourth Report ). The category of specialized non-dominant carriers includes entities like MCI and Sprint. See MCI Telecommunications Corp., 765 F.2d at 1189. The Commission made the permissive forbearance policy mandatory in In re Policy and Rules Concerning Rates For Competitive Common Carrier Services and Facilities Authorizations Therefor, Sixth Report and Order, 99 F.C.C.2d 1020 (1985), but the United States Court of Appeals for the District of Columbia has vacated that order, holding that the Commission violated the plain language of section 203(a) of the Act. MCI Telecommunications Corp., 765 F.2d at 1195-96. The court's ruling was limited to the mandatory policy precluding non-dominant carriers from filing tariffs and eschewed consideration of the Commission's permissive forbearance policy. Id. at 1196. It is the Commission's permissive forbearance policy that Richman claims undermines the tariff's effect as a complete defense to unintentional torts.IV.
 
 
 25
 Richman is a wholesale dealer and distributor of records, cassettes, compact discs and related merchandise. It communicates with most of its customers out of its office in Pennsauken, New Jersey, by telephone. Until October 1, 1987, Richman's long-distance telephone service was provided by Telesphere, Incorporated (Telesphere). In May of 1987, Harry Bogaev (Bogaev), a Sprint representative, called Richman's Vice-President Mark Small (Small) to solicit Richman's long-distance telephone service.
 
 
 26
 On June 8, 1987, Bogaev presented Small with a proposal from Sprint. Sprint claimed its proposal would save Richman twelve percent on its long-distance phone bills and at the same time provide personally tailored, quality service. Small says that Richman, in accepting Sprint's offer to switch to its long-distance service, relied on the promises of quality service Bogaev made on Sprint's behalf both in the proposal and during Bogaev's sales call. In his proposal Bogaev suggested that Richman subscribe for twelve "Dial 1 WATS" lines and six "Sprint Advanced WATS Plus" lines.
 
 
 27
 About five weeks later, Bogaev contacted Richman to confirm its acceptance of Sprint's proposal. Bogaev told Richman's Office Manager Holly Cass (Cass) that Richman would receive an additional ten percent discount for the first ten months of service by Sprint. The discount was in accord with Sprint's tariff.
 
 
 28
 On July 20, 1987, Cass executed an Advanced WATS Plus Sales Agreement. It provided for the installation of six Sprint Advanced WATS Plus lines. Cass also executed a Dial 1 WATS Sales Agreement. It provided for the installation of twelve Dial 1 WATS lines integrated with the lines of Richman's local phone company. The Dial 1 WATS agreement included a statement that not only the rates but also the conditions for service were contained in a tariff Sprint had filed with the Commission.
 
 
 29
 Contemporaneously with its execution of the sales agreement, Richman also signed, at Bogaev's behest, a "letter of agency" on Richman's stationary. Small says he was under the impression that Sprint would use the letter of agency as evidence of Sprint's authority to deal with everyone whose help would be needed to ensure a smooth changeover in Richman's long distance service from Telesphere to Sprint. Sprint, on the other hand, says that it solicited the letter for the sole purpose of helping Sprint in its dealings with Richman's supplier of telephone equipment, Langer Communications, Incorporated, concerning the six Advanced WATS Plus lines. Sprint contends that the letter had nothing to do with the twelve Dial 1 WATS lines that New Jersey Bell would have to convert.
 
 
 30
 On October 1, 1987, Sprint began providing service to Richman. The six Sprint Advanced WATS Plus lines functioned properly. The twelve Dial 1 WATS lines did not. The twelve Dial 1 WATS lines did accept incoming phone calls and Richman had no difficulty in making outgoing local calls. All twelve Dial 1 WATS lines, however, were unable to place long distance calls. Whenever Richman attempted to make an outgoing long-distance phone call through the Dial 1 WATS lines, it received the message "You've entered an invalid authorization code." App. at 147.
 
 
 31
 Cass sought Bogaev's assistance to correct the problem Cass says Bogaev told her that the Sprint lines were fine, that the problem was with New Jersey Bell and that he would work with New Jersey Bell to correct it. On Bogaev's instruction Cass called New Jersey Bell. New Jersey Bell told her that it had checked its lines into Richman and found no problem. Cass then asked Bogaev to send out a Sprint technician to look into the problem. According to Small, Bogaev rejected that request, telling Small that sending a Sprint technician out to Richman's office would be useless because the problems were in New Jersey Bell's lines. Richman tried to solve the problem through New Jersey Bell, but New Jersey Bell told Small that Richman would have to work the problem out with Sprint because the letter of agency Richman had given Sprint made Sprint, not Richman, New Jersey Bell's customer.
 
 
 32
 On December 9, 1987, Bogaev authorized an expedited order to install six additional Advanced WATS Plus lines by January 9, 1988. Sprint did not transmit this order to New Jersey Bell until January 15. According to Sprint, the delay in transmission occurred when its credit department held up the order after noting that Richman had not paid its bills.
 
 
 33
 Richman says it finally made contact with a Sprint technician in January who tentatively identified the source of the problem as "dialers" left over from Richman's prior carrier, Telesphere. Dialers are small computers with a software program that automatically patches a caller into a long-distance line. The program causes the computer to dial a pre-set authorization code when activated by an attempt to place an outgoing long-distance call. As it turned out, Telesphere had left its dialers plugged into the system and they had been programmed to work only with Richman's Telesphere customer code, a code which was invalidated when Richman terminated its relation with Telesphere. As a result, each attempt to place an outgoing long-distance call went through the dialer in a fruitless effort to access Telesphere's network, now closed to Richman, instead of the network Richmond had opened with Sprint.
 
 
 34
 When Bogaev next visited Richman, he was told about the technician's hunch and quickly located and disconnected the dialers. At once, the twelve Dial 1 WATS lines became operational for outgoing long-distance phone calls. The six additional Sprint Advanced WATS Plus lines that Sprint's credit department had held up were then not needed and so never installed. Richman refused to pay Sprint's charges and persisted in that refusal until August 1988, when Sprint terminated its relationship with Richman for non-payment. These consolidated actions followed.
 
 V.
 
 35
 The United States District Court for the District of New Jersey had diversity jurisdiction over these consolidated cases pursuant to 28 U.S.C.A. § 1332 (West 1966 & Supp.1991). It also had jurisdiction over the claims under the Act brought by Sprint under 28 U.S.C.A. § 1337(a) (West Supp.1991) (providing district courts with original jurisdiction over actions arising under an Act of Congress that regulates commerce). Whether we have jurisdiction to decide this appeal on the merits has been the subject of extensive argument by the parties. There is, of course, no question that we have both the power and the duty to consider the case to the extent necessary to resolve any jurisdictional issue. See, e.g., Bender v. Williamsport Area School Dist., 475 U.S. 534, 541-49, 106 S.Ct. 1326, 1331-36, 89 L.Ed.2d 501 (1986). In that context, we turn to the issue of appellate jurisdiction--an issue that turns upon the finality vel non of the district court's order transferring the case to the Commission and staying judicial proceedings, at least until the Commission decides the merits of Sprint's contention that its liability to Richman is limited by the terms of its tariff.
 
 A.
 
 36
 Sprint's arguments against appellate jurisdiction are premised on its characterization of the district court's order as one that merely transferred the issue of the validity of the tariff to the Commission while staying the rest of the proceedings. From this premise, Sprint argues that this Court does not have jurisdiction because the district court's order is neither a final order nor an appealable interlocutory order.
 
 
 37
 Richman characterizes the district court's order differently. It construes it as a complete transfer of the case, including its state-law claims, to the Commission, effectively putting Richman out of court. Richman analogizes the district court's order to decisions to abstain that are appealable because they end the litigation in the district court.
 
 
 38
 Ordinarily we construe district court orders "by examination of just the 'four corners' of the document." Ford Motor Co. v. Summit Motor Prods., Inc., 930 F.2d 277, 286 (3d Cir.) (quoting United States v. Reader's Digest Ass'n, Inc., 662 F.2d 955, 961 (3d Cir.1981), cert. denied, 455 U.S. 908, 102 S.Ct. 1253, 71 L.Ed.2d 446 (1982)), cert. denied, --- U.S. ----, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991). If, however, the order has "any ambiguity or obscurity or if the judgment fails to express the rulings in the case with clarity or accuracy, reference may be had to the findings and the entire record for the purpose of determining what was decided." Id. (quoting Security Mut. Casualty Co. v. Century Casualty Co., 621 F.2d 1062, 1066 (10th Cir.1980)). "[I]t 'is our responsibility to construe a judgment as to give effect to the intention of the court, not to that of the parties.' " Id. (quoting United States v. 60.22 Acres of Land, More or Less, Situate in Klickitat County, State of Wash., 638 F.2d 1176, 1178 (9th Cir.1980), cert. denied, 451 U.S. 985, 101 S.Ct. 2318, 68 L.Ed.2d 842 (1981)). We review the district court's order with these teachings in mind.
 
 
 39
 Here the district court's order, when read together with its opinion, is ambiguous. Accordingly, we must first decide what the district court meant when it decided to "transfer the action" to the Commission. In its order, the district court wrote:
 
 
 40
 [P]laintiff is hereby permitted to file an amended complaint alleging claims based in fraud and misrepresentation within 10 days of receipt of this Opinion and Order and defendants are permitted to file an appropriate responsive pleading within 10 days of receipt of plaintiff's amended complaint. Upon receipt of defendant's answer to the amended complaint, the Clerk of the Court is hereby ORDERED to immediately transfer this action to the Secretary of the Federal Communications Commission.
 
 
 41
 App. at 370 (emphasis added). Richman relies on the sentence we have emphasized, especially the words "transfer this action," when it argues that the court sent the case, state claims and all, to the Commission. This reading comports with the commonly accepted legal definition of the word "action." See Black's Law Dictionary 26 (5th ed. 1979) (action "in its usual legal sense means a suit brought in a court"). Richman's position also gains some support in language that the court uses at the conclusion of its opinion:
 
 
 42
 After service of the amended complaint has been effectuated upon defendant, it shall be afforded 10 days to file an appropriate responsive pleading. Immediately thereafter, the Clerk of the Court is directed to transfer the action to the Secretary of the Federal Communications Commission.
 
 
 43
 App. at 390. Here, the district court again refers to a transfer of "the action" to the Commission.
 
 
 44
 At another point in its opinion, the district court's language could be read to support the position of either Sprint or Richman. In the introduction to the opinion, the court wrote that it would:
 
 
 45
 deny the relief requested by plaintiff and instead thereof stay the proceedings and transfer the matter to the Federal Communications Commission.
 
 
 46
 App. at 372-73. Here the court wrote that it would transfer "the matter," a phrase that Richman says means the same as "the action." The court, however, also said that it would stay the proceedings while transferring "the matter" to the Commission, a procedural ruling that makes no sense if the court had decided it would never have anything more to do with the case. If "the matter" were synonymous with "the action," everything would have been sent to the Commission and there would be nothing left to stay. Black's Law Dictionary defines "matter" more narrowly than "action." Black's says "matter" has the meaning of "[s]ubstantial facts forming [the] basis of [a] claim or defense" and refers the reader to the word "issue." See Black's Law Dictionary 882 (5th ed. 1979). This cross-reference supports Sprint's interpretation of the order as transferring to the Commission just the issue of the validity of the tariff provision limiting liability that Sprint asserts as a defense.[4]
 
 
 47
 Elsewhere in its opinion, the district court says:
 
 
 48
 Upon analysis of the issues before it, this court concludes that the instant matter should be transferred to the FCC.
 
 
 49
 App. at 387. If the word "issues" in this sentence is limited to the issues concerning the effect of a liability limitation in a non-dominant carrier's tariff, this sentence is similar in its tenor to the quoted language from the district court's opinion that refers to a transfer of "the matter." Unlike the language in the introduction, however, the last quoted sentence is set amidst the court's discussion of the doctrine of primary jurisdiction and the issue of the tariff's validity as a limit on liability. In this context, it becomes difficult to construe the word "issues" to mean anything beyond those issues that are within the Commission's primary jurisdiction over the effect of Sprint's tariff. One other portion of the opinion supports this construction. The court states:
 
 
 50
 Because at least some of the plaintiff's claims are covered by its tariff, resolution of the issue whether tariffs apply to non-dominant carriers is necessary. For the reasons which follow, however, the proper forum to adjudicate that issue, at least initially, is the FCC.
 
 
 51
 App. at 385 (footnote omitted).
 
 
 52
 While the order, standing alone, directs the transfer of "this action" to the Secretary of the Commission and so may seem unambiguous, the order's clarity disappears in the context of the opinion, the regulatory background and the procedural posture of the case. Though the word "action" in the order is normally the equivalent of the word "case" in legal parlance, in this case that construction puts the order at war with the rulings in the opinion. The language in the opinion staying the case pending transfer of "the issue whether the tariffs apply to non-dominant carriers," app. at 385, belies the language of the order. Since the opinion, at still other times, speaks of transferring "the matter," i.e., the tariff issue, see supra at 1439 (citing Black's Law Dictionary at 882), rather than "the action," the references to a stay strongly indicate that the court intended Richman's claims to remain pending on its docket while the tariff issue was reviewed by the Commission.
 
 
 53
 Additionally, the opinion, read as a whole, is limited to consideration of whether the tariff issue should be referred to the agency. The district court never discusses transferring all of Richman's claims to the Commission. Therefore, we believe that the court's use of the language "this action" or "the action" once in its order and twice in its opinion was just an inexact use of that term. We construe the order under appeal to transfer only the tariff issue to the Commission and to stay further judicial proceedings until the Commission exercises its primary jurisdiction over the tariff issue, but with jurisdiction retained in the meantime.
 
 B.
 
 54
 Since the order, as we construe it, transfers no more than the tariff issue to the Commission, we are now in a position to determine if it is appealable. According to Richman, we have appellate jurisdiction over the order transferring the tariff question to the Commission under 28 U.S.C.A. § 1291 (West Supp.1991). Section 1291 reads, in pertinent part:
 
 
 55
 The courts of appeals ... shall have jurisdiction of appeals from all final decisions of the district courts of the United States ... except where a direct review may be had in the Supreme Court.
 
 
 56
 28 U.S.C.A. § 1291. Richman argues, on analogy to abstention, that the district court's order is final, even if it merely stays its action. Since we interpret the district court's order as an order that does not effectively put Richman out of court but rather merely stays proceedings pending administrative resolution of the validity of Sprint's effort to limit its liability for negligence by tariff, we do not reach Sprint's argument that we do not have appellate jurisdiction under Bergman. Bergman held that when a final judgment is entered in one of two consolidated actions, that judgment is not appealable until a final judgment is entered in the other consolidated action. Bergman, 860 F.2d at 567. Here, final judgment has not been entered in either Sprint's or Richman's action. Thus, absent appellate jurisdiction under the Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), see infra at 1446-1448, gloss on section 1291 finality, our appellate jurisdiction depends entirely on Richman's analogy to abstention. We note, however, that while a Commission decision upholding the provision in Sprint's tariff limiting its liability would effectively put an end to Richman's negligence claim, it would not end Sprint's case against Richman since Richman could still claim Sprint's negligence justified its non-payment of Sprint's charges. Moreover, Richman's remaining claims for intentional wrongdoing and fraud would remain pending whatever the Commission decides because the limitation on liability that Sprint has inserted into its tariff does not apply to intentional wrongs.
 
 
 57
 It is fair to say, however, that this Court, with one possible exception which we will discuss later, has never been squarely faced with or decided the question this case presents, namely: Is an appeal of an order that stays a lawsuit while referring a question to a federal administrative body under the doctrine of primary jurisdiction an appeal from a "final decision" under section 1291? Accordingly, we look to decisions of this Court that presented similar issues and reason by analogy from them. We turn therefore to Richman's argument that the present district court's stay order is final, on analogy to abstention.
 
 
 58
 In Van Cauwenberghe v. Biard, 486 U.S. 517, 521-22, 108 S.Ct. 1945, 1949-50, 100 L.Ed.2d 517 (1988), Justice Marshall, writing for a unanimous Court explained that:
 
 
 59
 A party generally may not take an appeal under § 1291 until there has been a decision by the District Court that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment."
 
 
 60
 Id. at 521, 108 S.Ct. at 1949 (quoting Catlin v. United States, 324 U.S. 229, 233, 65 S.Ct. 631, 633, 89 L.Ed. 911 (1945)). The Supreme Court's language in Van Cauwenberghe guides our analysis of the appealability of the district court's order transferring to the Commission the discrete issue of the validity of the limit on common-law liability for unintentional wrongs that Sprint inserted in its tariff.
 
 
 61
 In Baltimore Bank for Cooperatives v. Farmers Cheese Cooperative, 583 F.2d 104 (3d Cir.1978), the Baltimore Bank for Cooperatives (Bank) advanced funds to a Chapter 11 debtor with the approval of the bankruptcy court in exchange for an assignment of certain accounts receivable. The Bank instituted an action against Farmers Cheese Cooperative (Farmers Cheese) to collect the accounts receivable. Id. at 106. The Commonwealth of Pennsylvania intervened, arguing that its Milk Marketing Board's (Board's) "power to supervise and regulate included the power to determine any and all liability incurred by Pennsylvania milk dealers to Pennsylvania milk producers." Id. The Commonwealth placed the assignor of the Bank's rights in the class of milk dealers and Farmers Cheese in the class of milk producers. Because of those classifications, the Board and Farmers Cheese contended the district court lacked jurisdiction. The district court abstained and the Bank appealed. Id. at 106-07.
 
 
 62
 Farmers Cheese sought to dismiss the appeal on the ground that the order appealed from was not a final decision under section 1291. We disagreed, holding that when a district court has abstained in deference to a state administrative body, the decision to abstain is a final one for purposes of section 1291. Id. at 108-09. For purposes of the case now before us, though, the importance of Farmers Cheese is our contrast of the order the Bank appealed from in that case with an order staying a case under the doctrine of primary jurisdiction. We indicated the latter would not be a final appealable order under section 1291.
 
 
 63
 In Farmers Cheese, we analyzed three cases Farmers Cheese cited in support of its argument to dismiss the appeal. See id. at 107-08 (discussing Allied Air Freight, Inc. v. Pan Amer. World Airways, Inc., 340 F.2d 160 (2d Cir.), cert. denied, 381 U.S. 924, 85 S.Ct. 1560, 14 L.Ed.2d 683 (1965), Chronicle Pub. Co. v. National Broadcasting Co., 294 F.2d 744 (9th Cir.1961) and Day v. Pennsylvania R.R., 243 F.2d 485 (3d Cir.1957)). Allied involved an order staying an antitrust action until further proceedings before the Federal Civil Aeronautics Board; Chronicle involved an order staying "two private antitrust actions pending a determination by the Federal Communications Commission ... of the propriety of the television network's acquisition of a local television station ...;" and Day involved an order staying a locomotive engineer's suit for back wages due under a collective bargaining agreement, pending the National Rail Adjustment Board's interpretation of the agreement. Id.
 
 
 64
 After summarizing these three primary jurisdiction cases, in each of which the appeal was dismissed, we said:
 
 
 65
 None of these cases are apposite to the instant case. In each of these cases, the district court merely stayed the proceedings in federal court until matters were determined initially by the appropriate federal agency. Such actions were appropriate applications of the doctrine of primary jurisdiction.
 
 
 66
 Id. at 108. We then contrasted the primary jurisdiction cases with abstention cases, which we held were final appealable decisions under section 1291:
 
 
 67
 In contrast, in the instant case the district [sic] did not stay the proceedings to await the determination of matters pending before federal agencies. Rather, in deference to the Pennsylvania [Milk Marketing Board], the district court, citing Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), invoked a species of administrative abstention in the belief that:
 
 
 68
 the comprehensive state statutory scheme should be given a "proper respect," and that matters the state desires to have determined administratively, and not in the first instance by its court system, should be determined by the state administrative system. Those matters should not by-pass that system by the fortuitous expedient of federal diversity jurisdiction.
 
 
 69
 In a Burford- type administrative abstention, the federal courts defer completely to the state courts so that:
 
 
 70
 administrative abstention does not merely postpone original federal jurisdiction, but actually displaces it, removing entirely from the original federal jurisdiction cases that fall within federal jurisdictional grants; a state court will dispose of all the issues in the case, subject to possible Supreme Court review, and whether or not such review is granted, res judicata will bar a party from having the federal court decide the issue anew.
 
 
 71
 Id. (footnote and some citations omitted) (emphasis added).
 
 
 72
 The teachings of Farmers Cheese are two-fold: administrative abstention orders, which completely relinquish federal jurisdiction by giving way to state administrative agencies, are final decisions appealable under section 1291; orders transferring discrete issues involving regulatory expertise under the doctrine of primary jurisdiction, by giving way to a federal administrative agency, are not final decisions appealable under section 1291. The difference between these two types of orders may be pointed up by a brief, but important, digression into the doctrine of abstention.
 
 
 73
 Abstention is based on "Our Federalism," Younger v. Harris, 401 U.S. 37, 44, 91 S.Ct. 746, 750-51, 27 L.Ed.2d 669 (1971), a "belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways." Id. Although it could be argued that a district court "abstains," using the plain-English meaning of the word, when it stays an action pending a decision of a federal administrative agency, the legal connotation of the term "abstention," within the context of the federal system, implies a federal court's judicial deference to a state court or state administrative body. See Pennzoil Co. v. Texaco, Inc., 481 U.S. 1, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987) (abstention to avoid interfering with ongoing state court civil proceedings); Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc., 477 U.S. 619, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986) (abstention to avoid interfering with ongoing state administrative proceedings); Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983) (abstention to avoid duplicative state court litigation when exceptional circumstances present); Younger, 401 U.S. 37, 91 S.Ct. 746 (abstention to avoid interfering with ongoing state court criminal proceedings); Louisiana Power and Light Co. v. City of Thibodaux, 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959) (abstention because of unclear state law in federal diversity case and important state interest at stake); Burford, 319 U.S. 315, 63 S.Ct. 1098 (abstention because of unclear state law where complex state administrative proceedings involved); Railroad Comm'n of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941) (abstention to avoid federal court constitutional rulings where state court's clarification of unclear state law could render ruling on federal constitutional issue unnecessary). See generally, E. Chemerinsky, Federal Jurisdiction 593-676 (1989) (discussing the various abstention doctrines). Generally, when a federal court abstains in deference to a state court or regulatory agency, the abstention necessarily ends the federal court's involvement with the suit. See Allen v. McCurry, 449 U.S. 90, 101 n. 17, 101 S.Ct. 411, 418 n. 17, 66 L.Ed.2d 308 (1980); E. Chemerinsky, supra at 605-06, 609, 625, 644, 647, 663-64. It is abstention's end to federal court proceedings in deference to state court or state agency proceedings that underlies the general rule that a district court's decision to abstain is appealable. See Moses H. Cone, 460 U.S. at 8-10, 103 S.Ct. at 932-934. The limit of the abstention cases' reach is demonstrated by the Court's language in Moses H. Cone:
 
 
 74
 We hold only that a stay order is final when the sole purpose and effect of the stay are precisely to surrender jurisdiction of a federal suit to a state court.
 
 
 75
 Id. at 10 n. 11, 103 S.Ct. at 934 n. 11. In other words, a district court's decision to abstain "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." Van Cauwenberghe, 486 U.S. at 521, 108 S.Ct. at 1949 (quoting Catlin, 324 U.S. at 233, 65 S.Ct. at 633).[5]
 
 
 76
 The distinction between abstention cases and this case based on the fact that here the district court's order does not defer to any state body is not the only reason that causes us to reject Richman's analogy abstention as a basis for appellate jurisdiction. In cases involving transfer of an issue or issues to a federal regulatory agency under the doctrine of primary jurisdiction, the case is not effectively out of federal court. See Farmers Cheese, 583 F.2d at 108. Even though the transferor-district court will be bound by the Commission's decision on the issue transferred, other methods of Article III court review exist to assure that even this issue is not effectively out of federal court. If either party is unhappy with the Commission's decision, the Act makes that decision subject to review in one of several appropriate courts of appeals. See 28 U.S.C.A. § 2343 (West 1978). Though the tariff issue may be reviewed by a court of appeals or perhaps the Supreme Court instead of the district court Richman is not effectively out of federal court. To so hold would be anomalous.
 
 
 77
 Accordingly, Richman's reliance on Schall v. Joyce, 885 F.2d 101 (3d Cir.1989), is misplaced. Schall was an appeal from a federal district court's order staying a case until a related state-court action was resolved. Id. at 103-105. There, we reasoned from Moses H. Cone that the district court's abstention order was appealable because " 'the object' of the district court's stay was 'to require all or an essential part of the federal suit to be litigated in a state forum.' " Id. at 105 (quoting Moses H. Cone, 460 U.S. at 10 n. 11, 103 S.Ct. at 934 n. 11). By analogy, Richman argues that the district court's order is a form of abstention that is therefore appealable because it forces it to litigate a key portion of its suit before the Commission.
 
 
 78
 We reject Richman's analogy to Schall not only because of the strong dictum in Farmers Cheese, but also because we think this case is more analogous to Nemours Found. v. Manganaro Corp., 878 F.2d 98 (3d Cir.1989), than to Schall. Nemours involved an appeal from a district court's order certifying two questions of Delaware state law to the Supreme Court of Delaware. We held that the order was non-appealable and distinguished Moses H. Cone:
 
 
 79
 Manganaro argues with some initial plausibility that a certification order is a species of abstention, and that therefore it is an appealable order under the precedent of Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 8-13 [103 S.Ct. 927, 932-936, 74 L.Ed.2d 765] (1983). On analysis, however, Manganaro's argument must fail. In Moses H. Cone, the Court held that an order of the district court staying federal proceedings brought to compel arbitration until the completion of the parallel state court proceedings was effectively final because the order had the effect of terminating the litigation in the federal forum.
 
 
 80
 . . . . .
 
 
 81
 Manganaro analogizes the certification to a refusal to adjudicate the merits. The analogy is not apt, however, because the certification order does not mean the effective end of the federal litigation. Further proceedings, including possibly a trial on the merits, will be held in the district court after the Delaware Supreme Court either answers the certified questions or declines to accept them. Therefore, Manganaro's argument that a certification order is a species of abstention and therefore appealable is unpersuasive.
 
 
 82
 Id. at 101 (emphasis added).
 
 
 83
 As in Nemours, but not as in Schall, the district court's order in this case is not a refusal to adjudicate the merits of the case. Also like Nemours, the possibility of a jury trial for Richman still looms on the horizon. We think the district court's transfer of an arguably controlling issue to the Commission's primary jurisdiction is more closely analogous to a certification of controlling state-law questions to a state supreme court than to a stay of federal judicial proceedings pending the conclusion of a related state case whose result is likely to control the outcome of the federal case.
 
 
 84
 Two other cases support our reasoning. In Cheyney State College Faculty v. Hufstedler, 703 F.2d 732 (3d Cir.1983), the plaintiffs, a class of faculty, alumni, students and prospective students of Cheyney State College claimed that Pennsylvania operated a de jure segregated system of higher education. Id. at 733-34. We stated:
 
 
 85
 The [district] court concluded that plaintiffs were required to exhaust administrative remedies under Title VI, and that the U.S. Department of Education had primary jurisdiction. The court stayed the suit until further order and directed defendants to report within 90 days on the progress of the administrative proceedings.
 
 
 86
 Id. at 735 (emphasis added).
 
 
 87
 We began our analysis of the appealability of the district court's order in Hufstedler by noting that stays are only appealable when they are tantamount to dismissal of the underlying suit. Id. (citing Farmers Cheese, 583 F.2d at 109). We noted that:
 
 
 88
 The stay in this case does not have the practical effect of a dismissal. Nothing in the district court's opinion or order intimates that the stay was intended to "deep six" the suit. Plaintiffs have not been put "effectively out of court."
 
 
 89
 Idlewild Liquor Corp. v. Epstein, 370 U.S. 713, 715 n. 2 [82 S.Ct. 1294, 1296 n. 2, 8 L.Ed.2d 794] (1962).
 
 
 90
 Id. We emphasized that "this stay is merely a temporary suspension of proceedings." Id. Finally, after noting the district court's mention of the proceedings before the Department of Education, as well as other litigation in another federal forum, we held that the stay order was not appealable. Id. at 735-36.[6]
 
 
 91
 Finally, the one case in which we were directly faced with the question of whether an order referring a question to a federal administrative body under the doctrine of primary jurisdiction is a final order appealable under section 1291 is Day v. Pennsylvania R.R., 243 F.2d 485 (3d Cir.1957) (Maris, J.). The result in that case also bolsters our reasoning that the present order transferring the tariff issue to the Commission is not a final order. Day was discussed and cited in Farmers Cheese in support of the contrast between abstention cases and cases involving transfers to federal administrative agencies under the principle of primary jurisdiction. See Farmers Cheese, 583 F.2d at 107-09; supra at 1441-1442. Analysis of the facts in Day implies a holding that orders referring a question to a federal administrative agency are not final appealable decisions for purposes of section 1291. In Day we dismissed a district court's stay of an action to collect back pay under a collective bargaining agreement until the National Railroad Adjustment Board construed the terms of the collective bargaining agreement for lack of appellate jurisdiction. Id. at 485-86. Unfortunately, Day does not contain any legal analysis in support of the proposition that an order staying an action while a federal agency considers an issue within its primary jurisdiction that the court has referred to it is not appealable. We began by stating:
 
 
 92
 At the outset we are met with the question whether the order in question is appealable. It is conceded that the order is interlocutory....
 
 
 93
 Id. at 486 (emphasis added). We then went straight on to examine Day's argument that the order was appealable as an interlocutory order granting or refusing an injunction under 28 U.S.C.A. § 1292(1),[7] rejected that argument, id. at 486-487, and dismissed the appeal, id. at 488. Given our independent duty to examine questions involving our jurisdiction, see Bender, 475 U.S. at 541, 106 S.Ct. at 1331, and the fact that no other grounds for appellate jurisdiction existed in Day, we must assume that the Court considered the section 1291 concession in Day before accepting it.
 
 
 94
 Even if Day is neither binding nor persuasive authority, our reasoning in Farmers Cheese, Nemours and Hufstedler is persuasive on the question of appellate jurisdiction now before us. Since the district court transferred only the tariff issue to the Commission, and the transfer will be fully reviewable after the Commission and the district court have acted, the order appealed from is not a final decision which "leaves nothing for the court to do but execute the judgment." Van Cauwenberghe, 486 U.S. at 521, 108 S.Ct. at 1949 (quoting Catlin, 324 U.S. at 233, 65 S.Ct. at 633).[8] Accordingly, we hold that a district court's transfer to a federal agency of a discrete issue subject to the primary jurisdiction of the agency is not a final order unless it falls within the narrow class of collateral orders that are treated as final by Cohen.
 
 C.
 
 95
 Richman makes only a limited argument that the district court's transfer order is final under the collateral-order doctrine Cohen has grafted on section 1291. See Cohen, 337 U.S. 541, 69 S.Ct. 1221. Cohen allows an appeal to be taken from an order that "conclusively determine[s] the disputed question, resolve[s] an important issue completely separate from the merits of the action, and [is] effectively unreviewable on appeal from a final judgment." Coopers & Lybrand v. Livesay, 437 U.S. 463, 468, 98 S.Ct. 2454, 2458, 57 L.Ed.2d 351 (1978). Richman asserts only that the "important issue" separate from the merits is whether the Commission can adjudicate its state-law claims. See Appellant's Memorandum Regarding Subject Matter Jurisdiction in Response to the Court's Order of July 25, 1990 at 10. Richman's Cohen argument is dependent upon its broad construction of the district court's order, a construction we have already rejected. See supra at 1438-1440. Thus, we quickly reject Richman's Cohen argument.
 
 
 96
 Nevertheless, mindful of our independent obligation to examine questions of jurisdiction, we go on to consider whether the district court's decision to put the validity of Sprint's tariff within the Commission's primary jurisdiction could, in the context of this case, be a second important issue separate and independent from the validity of the tariff itself. In that context, we consider whether the existence vel non of primary jurisdiction in the Commission is itself an important issue separate from the merits. We must also decide whether that determination is effectively unreviewable because the primary jurisdiction question may no longer be open on appeal from the final decision the district court will render on Richman's claim. See Rolo v. General Dev. Corp., 949 F.2d 695, 700 (3d Cir.1991). The tariff issue will have been finally administratively determined and, possibly, judicially reviewed before the district court renders its decision.
 
 
 97
 Since the validity of Sprint's tariff limiting liability controls the merits of Richman's negligence claim, unless the district court's referral to the Commission is an issue separate from the issue of the tariff's validity, the question of the Commission's primary jurisdiction cannot be classed as an important issue separate from the merits. See Livesay, 437 U.S. at 468, 98 S.Ct. at 2457. Separation of the district court's referral of the tariff issue to the Commission from the issue of the tariff's validity would, however, be not only inconsistent with the jurisprudence of this Court that we have outlined in the preceding section of this opinion, but it also would be unsound as a matter of policy. Cutting the issue of primary jurisdiction loose from the merits of the issue referred would leave us prone to an indeterminate extension of the finality doctrine in cases involving administrative expertise and could lead to appeal from every order transferring to an administrative agency merits within primary jurisdiction. See Rolo, at 700 ("Moreover, 'the collateral order doctrine has always been construed narrowly by this [C]ourt, "lest the exception swallow up the salutary general rule" that only final orders may be appealed.' " (quoting Praxis Properties, Inc. v. Colonial Sav. Bank, 947 F.2d 49, 54 (3d Cir.1991) (other citations omitted))). Were that to happen here, the Commission's consideration of the tariff issue would be delayed while the issue of primary jurisdiction was pending on appeal. Thereafter, the agency's delayed resolution of the tariff issue would be subject to separate judicial review under 47 U.S.C.A. § 402(a) and 28 U.S.C.A. § 2342(1) (West 1978).[9] Following judicial review of the tariff issue under these statutes, the district court's final orders resolving Sprint's and Richman's claims would again be appealable to this Court. Such piecemeal consideration strikes at the heart of the rationale behind the finality doctrine. Accordingly, we are unwilling to separate the issue of primary jurisdiction from the tariff issue. Since the tariff issue is plainly a merits question that is inextricably bound up with the issue of primary jurisdiction, the latter is not an important issue separate from the merits as Cohen requires. See Rolo, 949 F.2d at 701 (If issue involves "scrutiny of the merits of the controversy" it is not an issue separate from the merits.); Praxis Properties, 953 F.2d at 57 (same) (citing Van Cauwenberghe, 108 S.Ct. at 1953).
 
 
 98
 Moreover, the Commission's resolution of the tariff issue is subject to effective judicial review and so that prerequisite to Cohen jurisdiction is also absent. Review of the Commission's final decision on the validity of Sprint's tariff is assured by 47 U.S.C.A. § 402(a), 28 U.S.C.A. § 2342(1) and 28 U.S.C.A. § 2343. These sections of the governing statutes provide for full judicial review of the Commission's decision on the merits of the tariff issue in either the United States Court of Appeals for the District of Columbia Circuit or "the judicial circuit in which the petitioner resides or has its principal office." 28 U.S.C.A. § 2343. We do not think Richman is deprived of effective judicial review merely because the governing statutes compel judicial review of the Commission's resolution of the tariff issue in a court other than the court that referred the question to the Commission for the Commission's resolution of an issue that could control final disposition of Richman's negligence claim.
 
 
 99
 At heart, the Cohen gloss on the finality doctrine is a practical one. It seems to us that it would be impractical, overly technical and destructive of the policy against piecemeal review to sever the issue of primary jurisdiction from the tariff issue and so treat the question of primary jurisdiction as an immediately appealable, independently important issue collateral to the merits. Thus, even though the district court's order may have conclusively determined the issue of whether Sprint's tariff's validity is within the Commission's primary jurisdiction, we do not think the Cohen doctrine provides us with appellate jurisdiction under section 1291.
 
 D.
 
 100
 Finally, Richman says that if the district court's order is not final, under Cohen or otherwise, we should treat its appeal as a petition for mandamus and grant the writ pursuant to 28 U.S.C.A. § 1651(a) (West 1966). We reject this argument because we believe granting a writ of mandamus is not appropriate in this case. The statutory and regulatory background to Richman's claim and Sprint's tariff defense on the basis of its limitation of liability set out earlier in this opinion, see supra at 1435-1436, show that the district court did not commit any clear error of law "at least approach[ing] the magnitude of an unauthorized exercise of judicial power, or a failure to use that power when there is a duty to do so," Lusardi v. Lechner, 855 F.2d 1062, 1069 (3d Cir.1988) (citing Will v. Calvert Fire Ins. Co., 437 U.S. 655, 661, 98 S.Ct. 2552, 2556, 57 L.Ed.2d 504 (1978); Citibank, N.A. v. Fullam, 580 F.2d 82, 86 (3d Cir.1978)), when it referred the tariff issue to the Commission. It is only errors of that magnitude that give us the discretion under section 1651 to grant mandamus or prohibition.
 
 
 101
 We are not, however, wholly unsympathetic to Richman's inability to secure prompt and cost-effective disposition of its negligence claim against Sprint. Those delays are unfortunate attendants upon the legal and technical complexities of our recently revamped national system of telecommunications. We assume, of course, that the Commission will undertake the proceedings necessary to resolve the issue the district court's order has referred to it within a reasonable time and proceed as expeditiously as possible to complete them. In the unlikely event the Commission does not do so, Richman is not barred from seeking help from the district court. Cf. Hufstedler, 703 F.2d at 735 (district court stayed action pending United States Department of Education proceedings and requested defendants to apprise court of progress of proceedings within ninety days); Day, 243 F.2d at 487 n. 6 (court of appeals sought report on progress of administrative proceedings).
 
 VI.
 
 102
 The district court's order transferring the tariff issue to the Commission is not a final order under 28 U.S.C.A. § 1291, under the Cohen doctrine or otherwise, and the prerequisites for mandamus are not present. Therefore, we will dismiss these appeals for lack of appellate jurisdiction. Each party shall bear its own costs.
 
 
 
 *
 Hon. Thomas N. O'Neill, Jr., District Judge of the United States District Court for the Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 Under Commission rulings, non-dominant carriers are telecommunication carriers who lack the economic power to exercise control individually over market rates for their services. Dominant carriers are carriers who exercise near monopoly power over rates and so can set their own rates without regard, or full regard, to the forces of supply and demand that impartially control a free market. AT & T is an example of a dominant carrier. Sprint and MCI are examples of non-dominant carriers. For a more detailed discussion of the development and evolution of the Commission's policy of deregulation see infra at 1435-1436
 
 
 [2]
 The court allowed this amendment even though it thought that the evidence that Richman had presented so far would not be enough to allow Richman to survive on a summary judgment motion by Sprint. It further found that Sprint would not be prejudiced by this amendment
 
 
 [3]
 Primary jurisdiction is a doctrine that requires a court to transfer an issue within a case that involves expert administrative discretion to the federal administrative agency charged with exercising that discretion for initial decision. See Baltimore Bank for Cooperatives v. Farmers Cheese Cooperative, 583 F.2d 104, 108 (3d Cir.1978). In Nader v. Allegheny Airlines, Inc., 426 U.S. 290, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976), Justice Powell wrote for a unanimous Court:
 The doctrine has been applied, for example, when an action otherwise within the jurisdiction of the court raises a question of the validity of a rate or practice included in a tariff filed with an agency, e.g., Danna v. Air France, 463 F.2d 407 (C.A.2 1972); Southwestern Sugar & Molasses Co. v. River Terminals Corp., 360 U.S. 411, 417-18, 79 S.Ct. 1210, 1214-15, 3 L.Ed.2d 1334 (1959), particularly when the issue involves technical questions of fact uniquely within the expertise and experience of an agency--such as matters turning on an assessment of industry conditions, e.g., United States v. Western Pacific R. Co., [352 U.S. 59, 66-67, 77 S.Ct. 161, 166-67, 1 L.Ed.2d 126 (1956) ].
 Id. 426 U.S. at 304, 96 S.Ct. at 1987.
 
 
 [4]
 Still another passage in the opinion highlights the district court's ambivalence in using the words "action" and "matter." In footnote seven of its opinion, the court used the language "transfer this action" but, in the prior sentence wrote that it was "transferring the matter to the FCC [for] resolution of the appropriate construction to be accorded to the tariffs." App. at 383
 
 
 [5]
 Pullman abstention is arguably an exception to this rule because it merely postpones the exercise of federal jurisdiction pending a state decision on a disputed question of state law. See Moses H. Cone, 460 U.S. at 10, 103 S.Ct. at 934 ("A district court stay pursuant to Pullman abstention is entered with the expectation that the federal litigation will resume in the event that the plaintiff does not obtain relief in state court on state-law grounds."). However, the Court still stated, in dictum, that Pullman abstention orders are appealable because they effectively put a plaintiff out of federal court. Id. at 9, 103 S.Ct. at 933 (citing Idlewild Bon Voyage Liquor Corp. v. Epstein, 370 U.S. 713, 715 n. 2, 82 S.Ct. 1294, 1296 n. 2, 8 L.Ed.2d 794 (1962) (per curiam)). This dictum seems inconsistent with the fact that a plaintiff faced with a Pullman abstention order will usually return to federal court to litigate its federal claims. Indeed, a Pullman abstention case will always return to federal court unless the plaintiff is victorious in the state forum and thereby obviates any need to litigate the federal constitutional issue underlying the Pullman abstention order. Id. at 10, 103 S.Ct. at 934. We followed this Moses H. Cone dictum by holding that abstention orders are immediately appealable in Hovsons Inc. v. Secretary of the Int., 711 F.2d 1208, 1211 (3d Cir.1983). Judge Garth's concurring and dissenting opinion in Hovsons elaborates on the doctrinal inconsistency of Moses H. Cone as well as the discussion of Idlewild in Moses H. Cone. See id. at 1214-16 (Garth, J., concurring and dissenting). In any event, the present case does not involve "Our Federalism" and Richman is not effectively out of federal court
 
 
 [6]
 The rationale of Terra Nova Ins. Co. v. 900 Bar, Inc., 887 F.2d 1213 (3d Cir.1989), also supports the conclusion that this stay order is not appealable. There, we observed that "[m]ost orders granting or denying a stay do not end the litigation. Therefore, they do not ordinarily fit within the general definition of final orders appealable under [section] 1291...." Id. at 1218. In Terra Nova, the order appealed from was a stay entered in a declaratory judgment action in which an insurer sought a ruling on its duty to defend and its duty to indemnify the insured in various state court actions. Id. at 1217. The stay extended until the conclusion of the state court actions. Id. at 1220. While we did not hold that the stay order was appealable as a "traditional" final order, we did hold that the stay of the duty to defend issue was an appealable collateral order under section 1291 and Cohen because it was effectively unreviewable on appeal from the final judgment of the district court. See Terra Nova, 887 F.2d at 1218-1221. For the reasons set forth later, see infra at 1446-1448, we do not think the stay order in this case is appealable under Cohen
 
 
 [7]
 This section was the predecessor to 28 U.S.C.A. § 1292(a)(1) (West Supp.1991) which grants the courts of appeals jurisdiction over appeals from interlocutory orders of the United States district courts "granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions...." 28 U.S.C.A. § 1292(a)(1)
 
 
 [8]
 This holding is also supported by our decision in Brotherhood of Maintenance of Way Employees v. Consolidated Rail Corp., 864 F.2d 283 (3d Cir.1988). In Brotherhood, a union and two employees challenged the employees' dismissals on grounds they were accident prone. They appealed the dismissal to the National Railroad Adjustment Board (Board). The Board upheld one dismissal but overturned the other without an award of backpay. Id. at 284. The union and the employees appealed the Board's decision in federal district court. The district court remanded the case to the Board for evidentiary proceedings because the Board had no evidence before it that showed that the employees were responsible for the accidents. Id. at 284-85. The defendant railway appealed the district court's decision. Id. at 285. We held that the order was not appealable because the railway could seek review of the district court's decision to remand the case after the Board had re-examined the case and the district court had reviewed the latter Board decision. Id. at 285-87
 Richman notes that Brotherhood involved a remand to an agency rather than a referral to an agency. Brotherhood is also arguably distinguishable because a court of appeals, and not the district court, will be reviewing the Commission's decision in this case. However, we find these distinctions unpersuasive. As we stated in Brotherhood:
 Our precedent holds that when the issue on appeal is limited to the right to a procedure that once granted is not susceptible as a practical matter to subsequent review, remand orders directing such procedures are final. In contrast, when the generally applicable principle of nonfinality of remand orders is followed, there is an opportunity to review the merits of the order challenged when the hearing on remand is concluded.
 Id. at 286 (emphasis added). The order transferring the tariff issue to the Commission falls within the second category of cases.
 
 
 [9]
 47 U.S.C. § 402(a) provides:
 Any proceeding to enjoin, set aside, annul, or suspend any order of the Commission under this chapter (except those appealable under subsection (b) of this section) shall be brought as provided by and in the manner prescribed in [sections 2341-51] of Title 28.
 28 U.S.C. § 2342(1) provides:
 The court of appeals (other than the United States Court of Appeals for the Federal Circuit) has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of--
 (1) all final orders of the Federal Communications Commission made reviewable by section 402(a) of title 47;
 28 U.S.C. § 2343 provides:
 The venue of a proceeding under this chapter is in the judicial circuit in which the petitioner resides or has its principal office, or in the United States Court of Appeals for the District of Columbia Circuit.